FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

Attorneys for Plaintiffs

[Additional Counsel Appear On Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

BETHE DANON and JOSEPH DAMORE, on behalf of themselves and all others similarly situated,

                    Plaintiffs,

          v.

QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, and DAVID YOUNG,

                    Defendants.

Case No. SACV12 - 01717 CJC (RNBx)

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Bethe Danon and Joseph Damore ("Plaintiffs"), individually and on behalf of the class defined below, allege this class action complaint based upon their own personal knowledge, as to their own acts and the acts and statements of Defendants (defined *infra*) in which Plaintiffs participated directly (the communications with, representations made, and documentation and information provided to Plaintiffs by Defendants in the ordinary course of business), and upon the investigation of counsel (and counsel's information and belief only to the extent expressly stated herein). Counsel's investigation conducted on Plaintiffs' behalf included, among other things: (i) an analysis of publicly available news articles and reports; (ii) a review and analysis of public filings, including but not limited to Securities and Exchange Commission ("SEC") filings by Defendants; (iii) press releases issued by Defendants; (iv) research of facts and the applicable law with respect to the claims asserted herein including the use of sophisticated investigatory tools such as *Bloomberg* subscription services, *LexisNexis* and other subscription services; and (v) other matters of public record. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action brought by Plaintiffs, on behalf of all persons and entities, other than Defendants, who purchased Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") common stock and/or call options or sold Questcor put options between April 26, 2011 through and including September 21, 2012 (the "Class Period") (the "Class"), seeking to recover damages caused by Defendants' violations of the federal securities laws. Plaintiffs allege claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2.      Questcor is a biopharmaceutical company that provides prescription drugs for the treatment of proteinuria in idiopathic types of nephrotic syndrome (or "NS"), the treatment of acute exacerbations of multiple sclerosis in adults (or "MS"), and the treatment of infantile spasms in children under two years of age (or "IS"). Its primary product is H.P. Acthar® Gel ("Acthar"), a sixty year old drug, which it provides for all of the above-mentioned indications. According to the Company's web site, Questcor's "highly experienced Sales and Marketing teams are presently focused on increasing the usage of our primary marketed product, Acthar, among specialists who treat patients with multiple sclerosis, infantile spasms and nephrotic syndrome. In addition, our Medical Affairs personnel are working with leading researchers to explore promising additional uses for this important product in a variety of other conditions."   Questcor Investor Relations Company Profile, http://ir.questcor.com/overview.cfm (last visited Oct. 3, 2012).

3.      The Company derives almost all of its revenue from sales of Acthar.

4.      Questcor purchased the rights to Acthar in 2001 for a mere $100,000 and in 2007, the Company became profitable "overnight" when it applied for orphan drug status and raised the price of the drug from $2,063 per vial to $29,086 per vial – an astonishing 1300% increase.

5.      The Company's strategy from that point forward would become very clear: "sell more Acthar."

6.      To that end, Questcor would aggressively expand its sales force and, at the same time, pursue wider uses for the drug.

7.      In pursuing its new strategy, Questcor has since made repeated false and misleading statements concerning the efficacy of Acthar, the potential for Acthar to be prescribed for additional ailments, the controversial marketing of Acthar, and the Company's resulting growth prospects.

8.      Ultimately, the Company's controversial marketing techniques were responsible for short-term, unsustainable growth. As a result, what transpired has

1 │ proven to be a scheme on behalf of Company insiders to inflate the stock price by
2 │ making false and misleading statements to the investing public in order to liquidate
3 │ their personal holdings at elevated prices, netting insiders in excess of $100 million.

4 │      9.    Investors, however, did not fare as well.  The stock plummeted 48% on
5 │ September 19, 2012, when Citron Research, a stock short-selling market research
6 │ company, reported that Aetna had issued a "clinical policy bulletin" stating it
7 │ considers Acthar medically necessary to treat infantile spasms, but not medically
8 │ necessary for certain other uses, including conditions that can be treated by
9 │ corticosteroids.

10 │      10.    The stock plummeted another 37% on September 24, 2012, when
11 │ Questcor filed a Form 8-K stating it had become aware of a U.S. government
12 │ investigation involving the Company's promotional practices.

13 │      11.    Defendants, individually and collectively, had a duty to Plaintiffs and
14 │ the Class to provide information regarding Questcor that did not contain material
15 │ misstatements or omit to disclose all information about Questcor that would be
16 │ material to Plaintiffs and the Class in their decisions to purchase shares of Questcor.

17 │ **JURISDICTION AND VENUE**

18 │      12.    Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the
19 │ Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated
20 │ thereunder (17 C.F.R. § 240.10b-5).

21 │      13.    This Court has jurisdiction over the subject matter of this action
22 │ pursuant to section 27 of the Exchange Act and 28 U.S.C. §§ 1331 and 1337.

23 │      14.    Venue is proper in this District because Defendants conduct business in
24 │ this District, and many of the wrongful acts alleged herein took place or originated
25 │ in this District.

26 │      15.    Most of the Defendants are either headquartered in this District or
27 │ maintain significant business presences here.

28

16.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and facilities of the national securities markets.

17.    Shares of Questcor are a security within the meaning of federal law.

18.    Shares of Questcor were sold to Class members who reside within this judicial district.

## PARTIES

19.    Plaintiff Bethe Danon purchased shares of Questcor during the Class Period, as evidenced by her annexed Plaintiff's Certification, and was damaged thereby.

20.    Plaintiff Joseph Damore purchased shares of Questcor as well as options positions that were net long during the Class Period, as evidenced by his annexed Plaintiff's Certification, and was damaged thereby.

**Defendants**

21.    Defendant Questcor is a California corporation headquartered at 1300 North Kellogg Drive, Suite D, Anaheim Hills, California 92807. Questcor is a biopharmaceutical company that provides prescription drugs for the treatment of multiple sclerosis, nephrotic syndrome, and infantile spasms indications. The Company's common stock trades on the NASDAQ under the symbol "QCOR."

**Individual Defendants**

22.    Defendant Don M. Bailey ("Bailey") joined Questcor in May 2007 and at all relevant times served as Questcor's President and Chief Executive Officer ("CEO") and Chairman of Questcor's Board of Directors. He joined Questcor's Board of Directors in May 2006.

23.    Michael H. Mulroy ("Mulroy") at all relevant times served as Questcor's Chief Financial Officer.

24.     Stephen L. Cartt ("Cartt") served as Questcor's Chief Business Officer from March 2005 through February 2012 and Chief Operating Officer since February 2012.

25.     David Young ("Young") at all relevant times served as Questcor's Chief Scientific Officer.

26.     These four individual Defendants are collectively referred to as the "Individual Defendants," and the Individual Defendants together with the Company are collectively referred to herein as "Defendants."

### CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all investors who purchased Questcor securities during the Class Period, excluding all officers and directors of Questcor and their immediate families.

28.     Members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members of the Class located throughout the United States.

29.     According to *Bloomberg,* there were 59,671,666 shares of Questcor common stock outstanding as of June 30, 2012.

30.     All members of the Class may readily be identified from records maintained by Questcor and/or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

31.     Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs and the other members of the Class, by virtue of their purchases of Questcor securities during the Class Period, have sustained damages as a result of Defendants' unlawful activities as alleged herein.  Plaintiffs have retained counsel

competent and experienced in class and securities litigation and intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class which Plaintiffs seek to represent.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

33.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants participated in the course of conduct complained of herein; and

(c)    Whether members of the Class have sustained damages as a result of Defendants' conduct, and the proper measure of such damages including, but not limited to, recessionary damages.

## SUBSTANTIVE ALLEGATIONS

34.    Questcor is a biopharmaceutical company that markets its only product, Acthar (repository corticotropin), an injectable drug that is approved by the United States Food and Drug Administration ("FDA") for the treatment of 19 indications. Of these 19 indications, Questcor currently generates substantially all of its net sales from three indications: the treatment of proteinuria in idiopathic types of nephrotic syndrome (NS), the treatment of acute exacerbations of multiple sclerosis (MS) in adults, and the treatment of infantile spasms (IS) in children under two years of age.

35.    Acthar was originally approved for use in the United States in 1952. The drug had fallen out of favor with the introduction of certain steroids, which

1  were made available for less than $100 per dose.  In fact, the steroids appear to be as

2  effective as Acthar for most indications.

3      36.    Nonetheless, Questcor's strategy in 2007 was to transform a

4  55 year-old, neglected drug into a blockbuster, without any new and meaningful

5  clinical data.

6      37.    Through the Company's controversial marketing in which it paid

7  doctors as much as $2,500 for each mention of the drug to another doctor,

8  Questcor's revenue has gone from $50 million in 2007 to $218 million in 2011, and

9  an anticipated $470 million in 2012.

10     38.    Although the Company re-priced Acthar as an orphan drug for rare

11 diseases (infantile spasms), it currently derives most of its revenue from more

12 widespread uses.

13     39.    Of the 19 FDA approved indications, Questcor derives most of its

14 revenue from Acthar prescriptions for NS, MS, and to a lesser extent, IS.

15     40.    Acthar prescriptions for NS went from 4 in Q2 2010, to 45 in Q2 2011,

16 to 314 in Q2 2012, and Acthar prescriptions for MS went from 304 in Q2 2010, to

17 751 in Q2 2011, to 1,110 in Q2 2012, as the Company dramatically increased the

18 number of sales representatives.

19     41.    Prescriptions for IS, for which Acthar received orphan drug status,

20 remain very low, representing less than 10% of the Company's revenue.

21     42.    Questcor has stated that it follows regulatory requirements and industry

22 standard practices, but according to a January 24, 2012 article by Melissa Davis of

23 *The Street Sweeper*,

24        [F]ormer Questcor insiders, who resigned from the company over

25        ethical concerns, tell a radically different story. As recently as last

26        summer, they say, Questcor operated no compliance program – and

27        offered no compliance training for its employees – at all. Rather, they

28        say, Questcor allowed its hard-driving sales division to call the shots

1   instead.

2                                    ****

3   Former Questcor insiders point to Chief Business Officer [Defendant]

4   Steve Cartt as the driving force behind that attitude. If nothing else,

5   records indicate, Cartt has certainly raised some eyebrows with his

6   lucrative stock sales. Last year, with Questcor celebrating the NS

7   market as a powerful new source of revenue, Cartt struck it rich by

8   dumping more than $15 million worth of the company's highflying

9   shares. While other Questcor leaders rushed to capitalize on that

10  amazing rally as well, records show, Cartt walked away with one of the

11  biggest fortunes of them all.

12  Melissa Davis, *Questcor: A Bold Strategy Threatened by the Fine Print?* THE

13  STREET SWEEPER, Jan. 24, 2012, *available at* http://www.thestreetsweeper.org/

14  undersurveillance/Questcor__A_Bold_Stragegy_Threatened_by_the_Fine_Print.

15      43.    In fact, Defendants were selling shares at inflated prices continually

16  while the Company was buying shares back through buy-back programs, at inflated

17  prices.

18      44.    Opting not to maintain (or establish) a firewall between its marketing

19  and medical divisions, Cartt, the Chief Business Officer, was appointed to handle

20  Medical Affairs after Dr. Jason Zielonka ("Zielonka") resigned, according to a Form

21  8-K filed by the Company on August 30, 2010.  Questcor Pharmaceuticals, Inc.,

22  Current Report (Form 8-K), at *3 (Aug. 30, 2010).

23      45.    In an attempt to make its marketing push for wider Acthar usage more

24  credible, Questcor, in a February 4, 2010 press release, had originally hailed the

25  arrival of Zielonka as well as the arrival of Defendant Young, stating:

26      "With the addition of Dr. Zielonka and the recent hiring of Dr. David

27      Young as Chief Scientific Officer, Questcor's management team is now

28      poised to fully develop the value of our key asset – Acthar," said

                                    - 8 -

[Defendant] Bailey. "This team will be working to further expand our existing markets, find new therapeutic uses for Acthar, and enhance the product life cycle of this important drug. Further, we are now positioned to intelligently explore opportunities to make the selective and economically prudent acquisitions of pharmaceutical assets, such as other compatible marketed products."

"As the head of Medical Affairs for Questcor, Jason will assume overall responsibility for collaborating with researchers on the more than two dozen on-going clinical and pre-clinical studies involving Acthar currently being sponsored by the Company," commented Mr. Bailey. "Nearly half of these research projects are evaluating Acthar in its on-label indication of nephrotic syndrome, a kidney disorder having high unmet medical need and significant commercial potential. Jason will also provide overall leadership for our team of medical science liaisons who regularly interface with the medical researchers performing these studies, as well as other physicians. In addition, Jason will oversee Questcor's Medical Information department, a crucially important function which provides medical data and information to physicians regarding the safe and effective use of Acthar. We also will look to Jason to play an integral role in our strategy to identify and evaluate additional diseases and disorders where Acthar could provide therapeutic value. We anticipate that Jason will make a significant contribution to our continued success."

Press Release, Questcor, Questcor Appoints Jason Zielonka, M.D. Chief Medical Officer (Feb. 4, 2010).

46.     However, Defendant Bailey's plans for Zielonka never came to fruition. In fact, Zielonka sacrificed over $700,000 worth of stock options when he

1   resigned after a tenure of only seven months, collecting compensation amounting to
2   only one half of his yearly salary, or $135,000.

3        47.     Despite Zielonka's abrupt departure, sales of Acthar and its expanded
4   uses continued to be the Company's goal.

5        48.     The Company's aggressive pursuit of growth in Acthar sales for the
6   treatment of MS and NS has driven unsustainable growth in Questcor. There is little
7   clinical evidence, however, as to the efficacy of the drug with respect to these
8   indications, and – as investors would find out – a collapse in the value of Questcor
9   stock would only be a matter of time.

10                    **DEFENDANTS' MATERIALLY MISLEADING**
11                     **STATEMENTS AND OMISSIONS**

12       49.     The Class Period begins on April 26, 2011, when Questcor issued a
13  press release stating its Q1 2011 financial results, stating in pertinent part:

14       "Our strategy to expand the sales force is clearly paying off," said Don
15       M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are
16       up sharply from last quarter. March was a particularly strong month
17       and this momentum has continued so far in April. We believe that
18       Acthar is filling an increasingly important role in the treatment of
19       exacerbations associated with MS and, looking forward, we expect to
20       continue to grow sales in this important therapeutic area."

21       Mr. Bailey added, "We are also encouraged by the early positive results
22       from our small, dedicated nephrology sales team, which initiated
23       selling efforts at the beginning of March. The number of nephrologists
24       who are using Acthar to treat patients with nephrotic syndrome is
25       increasing. In addition, during the second quarter we will initiate a
26       company-sponsored Phase IV trial to study Acthar in the treatment of
27       NS associated with idiopathic membranous nephropathy. Acthar is
28       indicated 'to induce a diuresis or a remission of proteinuria in the

1   nephrotic syndrome without uremia of the idiopathic type or that due to
2   lupus erythematosus'."

3   Press Release, Questcor, Questcor Reports Record First Quarter Net Sales (Apr. 26,
4   2011).

5       50.    On April 26, 2011, Questcor conducted an investor conference call
6   during which the following statements were made by Defendants:

7   **Defendant CEO Bailey**:  In summary, we are off to a very good start
8   this year as we continue to execute our straightforward strategy to sell
9   more Acthar. Our decision to expand the MS sales force is clearly
10   paying off.

11           ****

12   We believe this MS sales performance reflects the strong underlying
13   demand for Acthar. This growth in demand is being driven by the
14   increasing productivity of our expanded sales force.

15           ****

16   **Defendant Cartt**:  Our expanded promotional activities directed to
17   neurologists generated significant growth in Acthar prescriptions for
18   MS during the first quarter.

19           ****

20   We believe this performance is a strong signal that the sales force
21   expansion has gained traction in the MS market at a faster rate than we
22   expected.

23           ****

24   Our promotional efforts are increasingly focused on two main goals.
25   One, convincing an increasing number of prescribers about the benefits
26   of using Acthar with their patients; and two, helping doctors, nurses
27   and others in their medical practice become more effective at
28   identifying potential Acthar patients.

****

We expect the increased Acthar call activity as well as further productivity gains by our sales personnel to drive continued MS sales growth through the remainder of 2011 and into 2012. In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs.

In these programs, existing Acthar prescribers present to small groups of physicians their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with follow-up sales calls, these programs appear to be a key driver of our sales growth. Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

****

Importantly, the recently published case series paper, combined with the clinical data sets expected to be available in November, should give us ample tools to grow Acthar prescriptions in nephrology until we complete the larger company-sponsored Phase IV study that is now underway.

Finally, as noted on previous calls, we have been conducting an in-depth assessment of the other 15 approved Acthar indications. This is an ongoing project and we have additional work to do in order to finalize our analysis.

Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Exhibit 99.1, at *1-4 (May 2, 2011).

51.  On July 26, 2011, Questcor issued a press release stating its Q2 2011 financial results, stating in pertinent part:

"Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow. Accordingly, growing MS sales remains our number one priority. Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

"To generate data in support of the expanded nephrology selling effort, we recently initiated a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy," continued Mr. Bailey. "And, today, we are announcing our fourth on-label target market for Acthar, systemic lupus erythematosus. We believe that this market has many of the same characteristics as our other three vertical markets for Acthar – MS, NS and IS."

"In the second quarter, our Specialty Sales Force of 77 representatives continued to achieve increased acceptance of Acthar among neurologists as a second-line therapy for MS exacerbations, resulting in a significant increase in Acthar prescriptions," commented Steve Cartt, Executive Vice President and Chief Business Officer.

Press Release, Questcor, Questcor Reports Record Second Quarter Net Sales (July 26, 2011).

52.   On July 26, 2011, Questcor conducted an investor conference call during which the following statements were made by Defendants:

1  **Defendant Bailey:**   As a result of this success in … NS, we are
2  immediately and substantially expanding our nephrology selling effort
3  without decreasing our resources or focus on MS. By substantially we
4  mean that the calling effort will be increased by over seven times once
5  the added sales representative are hired and trained.

6
7  The exceptional MS and NS sales growth along with a very good [IS]
8  sales quarter, naturally led to a record Acthar vials shipped, record sales
9  and record earnings. In addition, today, we are announcing the fourth
10  vertical market we aim develop for Acthar, which is lupus.

                                    ****
11
12  **Defendant Cartt:** Our specialty sales force of 77 representatives
13  continued  to  achieve  increased  acceptance  of  Acthar  among
14  neurologists for the treatment of MS relapses during the second quarter.
15  During the quarter, we shipped a record 751 paid Acthar prescriptions
16  for the treatment of MS relapses. This was an increase of 147% over
17  the year ago period and 48% over the previous quarter. We believe this
18  performance as a strong signal that the sales force continues to gain
19  traction in the MS market at a faster rate than we expected.

                                    ****
20
21  Our promotional efforts remain focused on two main goals. One,
22  convincing an increasing number of prescribers about the benefits of
23  using Acthar with their patients; and two, helping doctors, nurses and
24  others in their medical practice more effective at identifying the right
25  patients for Acthar.

                                    ****
26
27  We have now identified [systemic lupus erythematosus or] SLE as the
28  next possible on-label commercial market for Acthar. We believe that

this market has many of the same characteristics, as our other three vertical markets for Acthar, MS, NS and IS.

\*\*\*\*

**Defendant Young:** In parallel with the NS sales efforts expansion, we recently initiated the Company's sponsored Phase IV trial to study Acthar in the treatment of NS associated with treatment resistant idiopathic membranous nephropathy, which is on label.

\*\*\*\*

We expect to generate clinical data from this trial that will further support our nephrology selling effort.

\*\*\*\*

**Defendant Bailey:**   Our go forward plan is extremely simple and remains to sell more Acthar.  That is, gross sales in each of our key markets, MS, NS, and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets.

\*\*\*\*

Now, we are adding fourth vertical market, lupus. Of course, we still have over a dozen additional on-label indications for Acthar that we are yet to analyze to determine their commercial potential.

Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Exhibit 99.2, at \*3, 6-7, 10, 12, 14 (July 29, 2011).

53.   On October 25, 2011, Questcor issued a press release stating its Q3 2011 financial results, stating in pertinent part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists

prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

Press Release, Questcor, Questcor Reports Third Quarter Financial Results (Oct. 25, 2011).

54.     On October 25, 2011, Questcor conducted an investor conference call during which the following statements were made by Defendants:

**Defendant Bailey:**  In the third quarter of 2011, we had 886 paid MS scripts compared with 323 scripts a year ago. The major factors behind the increased prescriptions are positive patient outcomes and the increasing productivity of our larger MS commercial team.

****

**Defendant Cartt:**  Switching gears to the subject of new scientific data, several Acthar related abstracts will be presented in November at the Annual Meeting of the American Society of Nephrology or ASN held this year in Philadelphia. These abstracts are available on ASN's website www.asn-online.org. The new data provide further insight into the immune-modulating and other therapeutic properties of Acthar

- 16 -

specifically relating to kidney disease. We believe availability of this data provides further evidence for the direct action of Acthar on kidney disease. Importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology.

Our emerging understanding of the apparent immune-modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Exhibit 99.2, at *2-4 (Oct. 27, 2011).

55.   On January 6, 2012, Questcor issued a press release reporting a strong finish to 2011, stating in pertinent part:

"During the past year, our increased investment in the expansion of our selling effort resulted in both increased awareness of the therapeutic benefits of Acthar within the medical community and strong returns for Questcor's shareholders," noted Steve Cartt, Executive Vice President and Chief Business Officer. "We currently intend to approximately double the number of nephrology representatives by the spring of 2012 and modestly expand the number of neurology representatives during the summer. We are also exploring the possibility of initiating a small pilot selling effort in rheumatology in the fall."

"Our Phase IV clinical trial studying the use of Acthar in treatment-resistant membranous nephropathy is underway, with the first patients having recently been enrolled," commented Dr. David Young, Chief Scientific Officer. "In addition, the FDA, through the review of our IND, has recently agreed with our Phase IIa study design

1    to evaluate the use of Acthar in diabetic nephropathy. Questcor's R&D
2    group is also exploring potential new studies to generate scientific data
3    related to the use of Acthar in treating additional autoimmune
4    conditions, with particular focus on those that are already on the FDA
5    approved Acthar label such as systemic lupus erythematosus. Overall,
6    we are becoming increasingly intrigued with the possible range of
7    therapeutic applications and commercial potential for Acthar as an
8    immunomodulating drug."

9    Press Release, Questcor, Questcor Pharmaceuticals Reports Strong Finish to 2011
10   (Jan. 6, 2012).

11       56.    On January 11, 2012, in response to *The Street Sweeper* story quoted
12   above, Questcor issued a press release, which stated in pertinent part:

13   The Company believes that its marketing and business practices are
14   consistent with regulatory requirements and industry standard
15   practices. Questcor markets H.P. Acthar® Gel for the treatment of
16   acute exacerbations of multiple sclerosis (MS) in adults, the treatment
17   of nephrotic syndrome, and the treatment of infantile spasms in
18   children under two years of age. The Company maintains a compliance
19   program, which is led by an experienced compliance officer and
20   includes the active participation of Questcor's executive management
21   team. Questcor attributes its success to the ability of Acthar to
22   potentially address the unmet medical need associated with MS
23   exacerbations and nephrotic syndrome. The Company is committed to
24   providing access to Acthar to patients who need it, and marketing
25   Acthar in accordance with regulatory requirements and industry
26   standard practices. Questcor plans to speak with the publication to
27   discuss the Company and its marketing and business practices.

28   Press Release, Questcor, Questcor Pharmaceuticals Issues Statement (Jan. 11, 2012).

57.   On February 22, 2012, Questcor issued a press release stating its Q4 and Full Year 2011 financial results, stating in pertinent part:

> "Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments. At the same time, we are continuing to build our understanding of the potential immune-modulating properties of Acthar, and are considering how best to study the broader possible therapeutic applications in other inflammatory and autoimmune diseases, many of which are already in the list of approved indications on the Acthar label."

Press Release, Questcor, Questcor Reports Fourth Quarter and Full Year 2011 Financial Results (Feb. 22, 2012).

58.   On February 22, 2012, Questcor conducted an investor conference call during which the following statements were made by Defendants:

**Defendant Bailey:**  As we look ahead to 2012 and beyond, we believe we can sustainably grow our business due to three key factors. First, Acthar provides benefits to many difficult-to-treat patients not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small. And third, we have assembled an excellent, experienced commercial team to pursue our growth plans.

****

**Defendant Cartt:**  A key priority of ours continues to be educating

both physicians and patients about how Acthar is a viable treatment option for MS exacerbations or relapses, particularly in those patients not well served by steroids, which are generally considered first-line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS. In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth: positive patient outcome, increasing awareness among neurologists about how best to incorporate Acthar into their practices, continued excellent Acthar insurance coverage for MS relapses, and the increase in productivity of our MS commercial team, all combined to generate this growth.

\*\*\*\*

**Defendant Young:**  Our scientific efforts and investments continue to expand. In addition to our ongoing research in nephrotic syndrome and multiple sclerosis, we're planning new efforts in lupus and other on-label indications which have autoimmune and inflammatory components, as well as an unmet medical need. In order to better understand how Acthar works in the many on-label indications, we will continue to significantly expand our non-clinical pharmacology efforts. This includes investigating how Acthar's biological activity differs from that of corticosteroids, such as methylprednisolone and prednisone. We've also received an IND from FDA to investigate the potential effects of Acthar in diabetic nephropathy, and plan to start the Phase IIa clinical study in the first half of this year.

\*\*\*\*

**Defendant Bailey:**  We believe that because Acthar provides real and

1    substantial benefits to many patients who would otherwise continue to
2    suffer the effects of serious difficult-to-treat disorders, our growth
3    should be sustainable. We are expanding the organization and
4    associated infrastructure to address the significant growth opportunities
5    in front of us. At the same time we are off to a good start to 2012 with
6    January MS, NS and IS paid prescriptions each having a good month.

7    Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Exhibit 99.2, at *2, 4,
8    6-7 (Feb. 27, 2012).

9        59.    On April 24, 2012, Questcor issued a press release stating its Q1 2012
10   financial results, stating in pertinent part:

11       "This faster-than-expected NS growth drove us to further expand the
12       NS commercial effort prior to the additional expansion of our MS
13       commercial team. At the same time, we continue to increase our
14       investment in efforts to learn about the possible therapeutic applications
15       of Acthar in other inflammatory and autoimmune diseases as well as
16       increase investments in our management systems, internal control, and
17       compliance infrastructure."

18                                    ****

19       "In addition, we are also planning to add approximately 30 more
20       representatives to our Neurology Sales Force, with hiring and training
21       expected to be completed sometime in August. We believe these
22       expansions will enable us to further broaden physician awareness of
23       Acthar and its appropriate role in the treatment of both MS relapses and
24       NS. Furthermore, we remain on track to initiate a pilot commercial
25       effort in rheumatology by the end of this year."

26

27       "We have been expanding our scientific efforts and R&D investments
28       in Acthar, and expect that we will continue to increase spending to

support Questcor's future growth," commented Dr. David Young, Chief Scientific Officer. "Currently, we are funding more than 40 pre-clinical or clinical studies and we have increased our investigation into better understanding how Acthar works and its other potential applications."

Press Release, Questcor, Questcor Reports First Quarter 2012 Financial Results (Apr. 24, 2012).

60. On April 24, 2012, Questcor conducted an investor conference call during which the following statements were made by Defendants:

**Defendant Bailey:** Questcor's unconventional, but simple business model continues to produce excellent financial results. Shipped vials, net sales, and earnings were all up well over 100% year over year. We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar and as a result, paid prescriptions continue to increase. Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment.

\*\*\*\*

**Defendant Cartt:** Insurance reimbursement for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved for this condition and there are few other treatment options. Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact, data from one study at the University of Toronto is being presented just this week at the Canadian Nephrology Society

Annual Meeting. This particular study found that about two-thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy had their proteinuria drop by 50% or more due to Acthar treatment.

****

**Defendant Young:**   As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are in fact a few other successful examples of the type of product. Soliris and Botox come to mind, for example.

We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications. In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs where we and others believe Acthar could provide a significant clinical benefit.

Currently, we have approximately 20 company-sponsored preclinical and clinical studies ongoing and are supporting around 20 ongoing investigator-initiated studies. Our present studies consist of those focused in three major areas: first, on pharmacology, which means better understanding of how Acthar works and how it is different from steroids or other melanocortin peptides; second, on producing additional supporting data for the commercial team for the 19 on-label indications; and third, on investigating new indications to support the potential future expansion of the label.

Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Exhibit 99.2, at *1, 3-4 (Apr. 26, 2012).

**Citron Research Report**

61.     Although *The Street Sweeper* research was already public for six months, some of its claims finally began to have traction with the issuance of the Citron Report.

62.     The Citron research report, entitled *Questcor (Nasdaq:QCOR): A Single Digit Stock in 18 Months or Less and Here's Why,* was issued on July 10, 2012, one day after the Company's common stock reached its all-time high closing price of $57.64.

63.     In its report, Citron questioned whether there was clinical data to support Questcor's strategy of expanding its marketing of Athcar to wider uses beyond IS.

64.     The Citron report also pointed out that Questcor's business model was unsustainable, and that management knew this to be the case as evidenced, in part, by its continual stock sales at inflated prices.

65.     On July 24, 2012, in the face of the negative Citron report, Questcor issued a press release concerning its Q2 2012 financial results, which stated in pertinent part:

> "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists. With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

Press Release, Questcor, Questcor Reports second Quarter Financial Results (July 24, 2012).

66.   On July 24, 2012, Questcor conducted an investor conference call during which the following statements were made by Defendants:

**Defendant Bailey:**  We expanded two sales forces and started building a third sales force in rheumatology using the same formula that worked so well with MS and nephrotic syndrome. And we also made good progress in both our science and compliance programs.

Questcor's financial results were driven by the increasing acceptance of Acthar among nephrologists and neurologists, as evidenced by the continued growth in nephrotic syndrome and MS paid prescriptions. These two uses of Acthar now each have annualized sales of approximately $200 million.

****

**Defendant Cartt:**  Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course; not everyone responds, but clearly, many patients are benefiting significantly from this drug and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

****

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse and the increasing productivity of our MS commercial team.

****

**Defendant Young:**  As you can see by our operating results reported in today's press release, we have been increasing our investment in

research and development to try to understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects – our objectives are to produce additional supporting data for the commercial team for on-label indications and to expand on Acthar Gel use through FDA beyond the current on-label indications.

Surprisingly, previous owners of Acthar Gel and the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many research areas that all need to be addressed by our R&D group in order to better understand ACTH and the clinical role of Acthar Gel.

****

In summary, I'd like to take you back to my initial topic, R&D expansion. As we had previously reported, our R&D efforts have been and are continuing to focus on three areas. First, producing additional supporting data for the commercial team for on-label indications; second, expanding Acthar Gel use beyond existing on-label indications and following FDA processes; and third, our greatest priority, better understanding the unique chemical, biological and clinical characteristics of Acthar Gel. Our research results from this third area thus far suggest that developing a generic drug for Acthar Gel would be very challenging. All three areas of research are intended to advance the science of Acthar Gel in order to further help patients with devastating autoimmune and inflammatory diseases.

Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), Exhibit 99.2, at *2, 4-5, 7, 11 (July 30, 2012).

67.    On September 19, 2012, Citron reported that Aetna had issued (on September 14, 2011) a "clinical policy bulletin" stating it considers Acthar

- 26 -

medically necessary to treat infantile spasms, but not medically necessary for certain other uses, including conditions that can be treated by corticosteroids.

68.   "Our previous position was that this was a last-resort treatment," Cynthia Michener, a spokesperson for the Hartford, Connecticut-based insurer, said in an e-mail according to *Bloomberg*. "We now state that it is not medically necessary because there is no clinical evidence that the drug is more effective than steroids."

69.   In response to the Aetna news, Questcor stock plunged 48% to $26.35.

70.   On September 19, 2012, Questcor issued a press release commenting on Aetna's insurance policy bulletin which stated in pertinent part:

> The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

Press Release, Questcor, Questcor Comments on Insurance Policy Bulletin (Sept. 19, 2012).

71.   On September 24, 2012, Questcor filed a Form 8-K with the SEC which stated in pertinent part:

> On   September 21, 2012, Questcor Pharmaceuticals, Inc. (the "Company") became aware of a U.S. government investigation involving the Company's promotional practices. The Company intends to cooperate with the government in its investigation. Company representatives will not be able to provide any additional information on this matter, other than through potential public Regulation

1   FD-compliant disclosures.

2   Questcor Pharmaceuticals, Inc., Current Report (Form 8-K), at *2 (Sept. 24, 2012).

3   72.   As a result of this disclosure, Questcor stock plunged an additional
4   37% to a closing price of $19.08 per share.

5   73.   The above statements demonstrate that Defendants have made repeated
6   materially false and misleading statements concerning the efficacy of Acthar, the
7   potential for Acthar to be prescribed for additional ailments, the controversial
8   marketing of Acthar, and the Company's resulting growth prospects.

9   74.   As a result of Defendants' materially false and misleading statements,
10   Plaintiffs and members of the Class purchased Questcor securities at inflated values,
11   and as the market became aware of Questcor's prior false and misleading statements
12   and omissions, Questcor's stock price reacted negatively, damaging Plaintiffs and
13   the Class.

14   **LOSS CAUSATION/ECONOMIC LOSS**

15   75.   During the Class Period, Defendants engaged in a scheme to deceive
16   the market and a course of conduct that artificially inflated Questcor's stock price
17   and operated as a fraud or deceit on purchasers of Questcor securities by
18   misrepresenting the Company's financial condition and accounting practices.  Once
19   Defendants' misrepresentations and fraudulent conduct were disclosed to the
20   market, Questcor's stock price reacted negatively as the artificial inflation was
21   removed from it.  As a result of purchases of Questcor securities during the Class
22   Period, Plaintiffs and other members of the Class suffered economic loss.

23   76.   Defendants' false and misleading statements had the intended effect
24   and caused Questcor stock to trade at artificially inflated levels throughout the Class
25   Period.

26   77.   As investors and the market became aware of Questcor's prior
27   misstatements and omissions and that its financial statements could not be relied
28   upon, Questcor's stock price reacted negatively, damaging investors.

## SCIENTER

78.    The volume, circumstances, and timing of Questcor's materially false and misleading statements as compared to the realities of its overall business operations demonstrates a cogent and compelling inference of scienter.  Defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements made or acted in reckless disregard of the true information known to them at the time.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-THE-MARKET DOCTRINE

79.    At all relevant times, the market for Questcor's common stock was an efficient market for the following reasons, among others:

(a)    Questcor's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b)    During the Class Period, Questcor stock was actively traded, demonstrating a very strong presumption of an efficient market;

(c)    As a regulated issuer, Questcor filed with the SEC periodic public reports during the Class Period;

(d)    Questcor regularly communicated with public investors via established market communication mechanisms;

(e)    Questcor was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(f)    Unexpected material news about Questcor was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

80.    As a result of the foregoing, the market for Questcor's common stock promptly digested current information regarding Questcor from all publicly available sources and reflected such information in Questcor's stock price.  Under

1  these circumstances, all purchasers of Questcor's securities during the Class Period

2  suffered similar injury through their purchase of Questcor's securities when the

3  stock was trading at artificially inflated prices, and a presumption of reliance

4  applies.

5  **NO SAFE HARBOR**

6      81.    The statutory safe harbor provided for forward-looking statements

7  under certain circumstances does not apply to any of the allegedly false statements

8  pleaded in this Complaint.  Virtually all of the specific statements pleaded herein

9  were not forward-looking or were not identified as "forward-looking statements"

10  when made.  To the extent there were any forward-looking statements upon which

11  Plaintiffs base their claims, there were no meaningful cautionary statements

12  identifying important factors that could cause actual results to differ materially from

13  those in the purportedly forward-looking statements.  Alternatively, to the extent

14  that the statutory safe harbor does apply to any forward-looking statements pleaded

15  herein, Defendants are liable for those false forward-looking statements because at

16  the time each of those forward-looking statements was made, the particular speaker

17  knew that the particular forward-looking statement was false, and/or the forward-

18  looking statement was authorized and/or approved by an executive officer of

19  Defendants who knew that those statements were false when made.

20      82.    The safe harbor does not apply to statements made, as here, in

21  connection with an initial public offering.

22  **COUNT I**<br>**(Against all Defendants For Violation of Section 10(b)**

23  **of the Exchange Act and Rule 10b-5)**

24      83.    Plaintiffs incorporate paragraphs 1-82 by reference.

25      84.    During the Class Period, Defendants disseminated or approved the

26  false statements specified above, which they knew or recklessly disregarded were

27  misleading in that they contained misrepresentations and failed to disclose material

28

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.    Defendants violated section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Questcor securities during the Class Period.

86.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Questcor securities and suffered damages when that inflation was eliminated by disclosure of information that revealed the facts and conditions hidden by Defendants' fraudulent statements and omissions, or the economic impact of those facts and conditions. Plaintiffs and the Class would not have purchased Questcor securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

87.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Questcor securities during the Class Period.

## COUNT II
**(Against all Defendants For Violation of  Section 20(a) of the Exchange Act)**

88.    Plaintiffs incorporate paragraphs 1-87 by reference.

89.    The Individual Defendants acted as controlling persons of Questcor within the meaning of section 20(a) of the Exchange Act. By reason of their positions as officers and/or directors of Questcor and their ownership of Questcor stock, the Individual Defendants had the power and authority to cause Questcor to

engage in the wrongful conduct complained of herein. Questcor controlled each of the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to section 20(a) of the Exchange Act.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs demand judgment individually and on behalf of the Class against Defendants, jointly and severally, as follows:

1.     An order declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, including Rules 23(a) and (b)(3), certifying the Class, and certifying their counsel as Class Counsel;

2.     Awarding Plaintiffs and the other Class members compensatory damages against Defendants, jointly and severally, for all damages suffered as a result of Defendants' violations of the Exchange Act in an amount to be proven at trial;

3.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, accountant fees, expert fees and other costs and disbursements; and

4.     Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

///
///
///
///
///
///
///
///
///
///

1

## **JURY TRIAL DEMANDED**

2

Plaintiffs demand a trial by jury on all issues so triable.

3

Dated:  October 4, 2012

4                                                                    WOLF HALDENSTEIN ADLER
                                                                          FREEMAN & HERZ LLP
5                                                                    FRANCIS M. GREGOREK
                                                                     gregorek@whafh.com
6                                                                    BETSY C. MANIFOLD
                                                                     manifold@whafh.com
7                                                                    RACHELE R. RICKERT
                                                                     rickert@whafh.com
8                                                                    MARISA C. LIVESAY
                                                                     livesay@whafh.com
9

10                                                                   RACHELE R. RICKERT

11                                                                   750 B Street, Suite 2770
                                                                     San Diego, CA 92101
12                                                                   Telephone:  619/239-4599
                                                                     Facsimile:   619/234-4599
13

14                                                                   WOLF HALDENSTEIN ADLER
                                                                          FREEMAN & HERZ LLP
15                                                                   GREGORY M. NESPOLE
                                                                     ALAN D. WEISS
16                                                                   270 Madison Avenue
                                                                     New York, New York 10016
17                                                                   Telephone:   (212) 545-4600
                                                                     Facsimile:    (212) 545-4653
18

19                                                                   Bruce G. Murphy
                                                                     LAW OFFICES OF BRUCE G. MURPHY
20                                                                   265 Llwyds Lane
                                                                     Vero Beach, FL  32963
21                                                                   Telephone:  828/737-0500

22                                                                   Maudisa McSween Collins
                                                                     1127 Thompson Road
23                                                                   Alabaster, AL 35007
                                                                     Telephone:  954/744-9850

24                                                                   Attorneys for Plaintiffs

25

26

27

28   QUESTCOR:19115.CPT

## PLAINTIFF'S CERTIFICATION

Bethe Danon ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in Questcor Common Stock securities during the Class Period specified in the Complaint are as follows:

| Date | Buy/Sell | # of Shares | Price |
|------|----------|-------------|-------|
| 9/19/12 | Buy | 200 | 31.31 |
| 9/19/12 | Buy | 200 | 28.28 |
| 9/20/12 | Buy | 400 | 27.72 |
| 9/20/12 | Sell | 400 | 29.8601 |
| 9/20/12 | Sell | 200 | 31.13 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of September 2012.

Bethe Danon

## PLAINTIFF'S CERTIFICATION

Joseph Damore ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in **Questcor Pharmaceuticals, Inc. (ticker "QCOR")** securities during the Class Period specified in the Complaint are as follows:

| **Date** | **# of Shares** | **Purchased/Sold** | **Price** |
|---|---|---|---|
| See attached schedule | | | |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.      To the extent plaintiff has served as a representative party for a class in an action filed under the federal securities laws, the cases are listed below, if applicable:

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27ᵗʰ day of September, 2012.

*Joseph D. Darmur*
Signature

Joseph D Darmore
Print Name

36810 Lake St.
Address

Ingleside IL 60041
City, State, Zip

224-210-2175
Phone

630-816-0131
Cell Phone

dmr697@yahoo.com
Email

/699622

Questor Stock Transactions

| Security Type | Date Puchased | # Shares/Securities | Price | Date Sold | # Shares/Securities | Price |
|---|---|---|---|---|---|---|
| Common stock | | | | | | |
| | 6/11/2012 | 59 | $45.49 | 6/11/2012 | 500 | $45.39 |
| | 6/11/2012 | 100 | $45.49 | 6/11/2012 | 200 | $45.39 |
| | 6/11/2012 | 700 | $45.49 | 6/11/2012 | 200 | $45.39 |
| | 6/11/2012 | 45 | $45.49 | 6/11/2012 | 100 | $45.39 |
| | 6/11/2012 | 96 | $45.49 | 6/11/2012 | 100 | $45.56 |
| | 6/11/2012 | 500 | $45.45 | 6/11/2012 | 200 | $45.56 |
| | 6/11/2012 | 200 | $45.45 | 6/11/2012 | 300 | $45.55 |
| | 6/11/2012 | 100 | $45.45 | 6/11/2012 | 100 | $45.55 |
| | 6/11/2012 | 100 | $45.45 | 6/11/2012 | 200 | $45.55 |
| | 6/11/2012 | 100 | $45.45 | 6/11/2012 | 100 | $45.56 |
| | 6/11/2012 | 1,000 | $45.67 | 6/11/2012 | 100 | $45.57 |
| | 6/11/2012 | 57 | $45.75 | 6/11/2012 | 200 | $45.53 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 200 | $45.53 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 200 | $45.53 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 200 | $45.53 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 200 | $45.53 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 1,000 | $45.65 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 1,000 | $45.59 |
| | 6/11/2012 | 43 | $45.75 | 6/11/2012 | 500 | $45.84 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 100 | $45.84 |
| | 6/11/2012 | 100 | $45.75 | 6/11/2012 | 100 | $45.86 |
| | 6/11/2012 | 100 | $45.73 | 6/11/2012 | 100 | $45.86 |
| | 6/11/2012 | 99 | $45.73 | 6/11/2012 | 100 | $45.87 |
| | 6/11/2012 | 801 | $45.73 | 6/11/2012 | 1,000 | $45.63 |
| | 6/11/2012 | 1,000 | $45.73 | 6/13/2012 | 800 | $47.87 |
| | 6/11/2012 | 1,000 | $45.52 | 6/13/2012 | 200 | $47.87 |
| | 6/11/2012 | 1,000 | $45.19 | 6/14/2012 | 900 | $46.28 |
| | 6/13/2012 | 300 | $47.59 | 6/14/2012 | 100 | $46.29 |
| | 6/13/2012 | 100 | $47.59 | 6/14/2012 | 800 | $46.73 |
| | 6/13/2012 | 100 | $47.59 | 6/14/2012 | 100 | $46.73 |
| | 6/13/2012 | 100 | $47.59 | 6/14/2012 | 100 | $46.73 |
| | 6/13/2012 | 400 | $47.57 | 6/14/2012 | 1,000 | $47.80 |

Questor Stock Transactions

| Security Type | Date Purchased | # Shares/Securities | Price | Date Sold | # Shares/Securities | Price |
|---|---|---|---|---|---|---|
| | 6/13/2012 | 400 | $47.81 | 6/14/2012 | 1,000 | $47.10 |
| | 6/13/2012 | 200 | $47.81 | 6/14/2012 | 1,000 | $46.87 |
| | 6/13/2012 | 300 | $47.81 | 6/14/2012 | 1,000 | $47.12 |
| | 6/13/2012 | 100 | $47.81 | 6/14/2012 | 100 | $46.85 |
| | 6/14/2012 | 100 | $46.72 | 6/14/2012 | 300 | $46.85 |
| | 6/14/2012 | 100 | $46.72 | 6/14/2012 | 100 | $46.85 |
| | 6/14/2012 | 200 | $46.72 | 6/14/2012 | 100 | $46.85 |
| | 6/14/2012 | 200 | $46.72 | 6/14/2012 | 100 | $46.84 |
| | 6/14/2012 | 200 | $46.72 | 6/14/2012 | 100 | $46.87 |
| | 6/14/2012 | 200 | $46.72 | 6/14/2012 | 100 | $46.93 |
| | 6/14/2012 | 500 | $46.57 | 6/14/2012 | 100 | $46.94 |
| | 6/14/2012 | 300 | $46.57 | 6/14/2012 | 800 | $46.68 |
| | 6/14/2012 | 100 | $46.57 | 6/14/2012 | 100 | $46.69 |
| | 6/14/2012 | 100 | $46.57 | 6/14/2012 | 100 | $46.59 |
| | 6/14/2012 | 1,000 | $47.46 | 6/14/2012 | 500 | $46.39 |
| | 6/14/2012 | 200 | $47.02 | 6/14/2012 | 100 | $46.42 |
| | 6/14/2012 | 100 | $47.02 | 6/14/2012 | 100 | $46.42 |
| | 6/14/2012 | 100 | $47.02 | 6/14/2012 | 100 | $46.43 |
| | 6/14/2012 | 400 | $47.02 | 6/14/2012 | 100 | $46.43 |
| | 6/14/2012 | 100 | $47.02 | 6/14/2012 | 100 | $46.43 |
| | 6/14/2012 | 100 | $47.02 | 6/14/2012 | 200 | $45.96 |
| | 6/14/2012 | 200 | $47.18 | 6/14/2012 | 100 | $45.96 |
| | 6/14/2012 | 300 | $47.18 | 6/14/2012 | 200 | $45.96 |
| | 6/14/2012 | 200 | $47.19 | 6/14/2012 | 100 | $45.96 |
| | 6/14/2012 | 100 | $47.19 | 6/14/2012 | 300 | $45.96 |
| | 6/14/2012 | 200 | $47.19 | 6/14/2012 | 100 | $45.96 |
| | 6/14/2012 | 1,000 | $46.94 | 6/14/2012 | 300 | $46.41 |
| | 6/14/2012 | 4 | $46.63 | 6/14/2012 | 200 | $46.41 |
| | 6/14/2012 | 100 | $46.63 | 6/14/2012 | 200 | $46.41 |
| | 6/14/2012 | 100 | $46.63 | 6/14/2012 | 300 | $46.45 |
| | 6/14/2012 | 200 | $46.63 | 6/15/2012 | 1,000 | $48.08 |
| | 6/14/2012 | 300 | $46.63 | 7/10/2012 | 100 | $43.75 |
| | 6/14/2012 | 100 | $46.63 | 7/10/2012 | 67 | $53.01 |
| | 6/14/2012 | 96 | $46.63 | 8/24/2012 | 1,500 | $43.36 |
| | 6/14/2012 | 100 | $46.63 | 8/24/2012 | 500 | $43.36 |

Questor Stock Transactions

| Security Type | Date Puchased | # Shares/Securities | Price | Date Sold | # Shares/Securities | Price |
|---|---|---|---|---|---|---|
| | 6/14/2012 | 1,000 | $46.48 | | | |
| | 6/14/2012 | 300 | $46.46 | | | |
| | 6/14/2012 | 300 | $46.46 | | | |
| | 6/14/2012 | 200 | $46.46 | | | |
| | 6/14/2012 | 200 | $46.46 | | | |
| | 6/14/2012 | 900 | $45.85 | | | |
| | 6/14/2012 | 100 | $45.85 | | | |
| | 6/15/2012 | 1,000 | $48.00 | | | |
| | 6/19/2012 | 67 | $50.50 | | | |
| | 7/10/2012 | 100 | $49.85 | | | |
| | 8/17/2012 | 1,000 | $39.00 | | | |
| | 8/17/2012 | 1,000 | $38.00 | | | |
| Options | 7/11/2012 | 5 Oct 45 Calls | $6.70 | | | |
| | 7/25/2012 | 5 Aug 39 Calls | $2.90 | 8/17/2012* | 10 Aug 39 Calls | $0.00 |
| | 7/25/2012 | 5 Aug 39 Calls | $3.20 | | | |
| | 7/27/2012 | 5 Aug 38 Calls | $2.85 | 8/17/2012* | 10 Aug 38 Calls | $0.00 |
| | 7/27/2012 | 5 Aug 38 Calls | $2.40 | | | |
| | 7/27/2012 | 5 Aug 38 Puts | $2.85 | 7/27/2012 | 2 Aug 38 Puts | $2.85 |
| | | | | 7/27/2012 | 3 Aug 38 Puts | $2.85 |
| | 7/30/2012 | 10 Oct 37 Calls | $5.09 | | | |
| | 7/30/2012 | 10 Oct 37 Calls | $4.90 | | | |
| | 8/6/2012 | 5 Oct 37 Calls | $4.70 | | | |
| | 7/30/2012 | 10 Oct 38 Calls | $5.09 | | | |
| | 7/30/2012 | 10 Oct 38 Calls | $5.00 | | | |

Questcor Stock Transactions

| Security Type | Date Puchased | # Shares/Securities | Price | | Date Sold | # Shares/Securities | Price |
|---|---|---|---|---|---|---|---|
| | 8/28/2012 | 10 Sep 42 Calls | $2.45 | | 8/28/2012 | 10 Sep 42 Calls | $2.66 |
| | 8/28/2012 | 10 Sep 42 Calls | $2.35 | | 8/29/2012 | 25 Sep 25 Calls | $2.55 |
| | 8/28/2012 | 15 Sep 42 Calls | $2.45 | | | | |
| | 8/29/2012 | 20 Sep 43 Calls | $2.05 | | 8/29/2012 | 40 Sep 43 Calls | $2.10 |
| | 8/29/2012 | 20 Sep 43 Calls | $2.05 | | | | |

*Options exercised

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1717 CJC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Rachele R. Rickert
Wolf Haldenstein Adler Freeman & Herz LLP
750 B Street, Suite 2770
San Diego, CA 92101
Tel: 619/239-4599; Fax: 619/234-4599

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| Bethe Danon and Joseph Damore, on behalf of themselves and all others similarly situated,<br><br>PLAINTIFF(S)<br>v.<br>Questcor Pharmaceuticals, Inc., Don M. Bailey, Michael H. Mulroy, Stephen L. Cartt, and David Young,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV12 - 01717 CJC (RNBx)**<br><br><br>**SUMMONS** |
|---|---|

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Rachele R. Rickert_____, whose address is _Wolf Haldenstein Adler Freeman & Herz LLP, 750 B St, Ste 2770, San Diego, CA 92101_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Dated:  __OCT - 4 2012__

Clerk, U.S. District Court
By: _Lori Wagers_____
        Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                          SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>Bethe Danon and Joseph Damore, on behalf of themselves and all others<br>similarly situated | DEFENDANTS<br>Questcor Pharmaceuticals, Inc., Don M. Bailey, Michael H. Mulroy, Stephen L.<br>Cartt, and David Young |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br><br>Rachele R. Rickert (190634)<br>Wolf Haldenstein Adler Freeman & Herz LLP<br>750 B Street., Suite. 2770, San Diego, CA 92101; Tel: 619/239-4599 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No     ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 78j(b) and 78t(a); 17 C.F.R. § 240.10b-5. Violations of the Securities Exchange Act of 1934

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**     Case Number: **SACV12 - 01717 CJC (RNBx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): 12-cv-01623-DMG-FMO; 12-cv-01707; 12-cv-01708 _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Bethe Danon--New Jersey<br>Joseph D. Damore--Illinois |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Questcor Pharmaceuticals, Inc.--Orange County<br>Remaining Defendants--unknown |  |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Count I--Orange County<br>Count II--Orange County |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): *Rachele R. Rickert*   Date October 4, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |